**SO ORDERED: May 06, 2011.**



**Basil H. Lorch III
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: ) | | |
| KENTUCKIANA MEDICAL ) | 10-93039-BHL-11 | |
| CENTER LLC, ) | | |
|     Debtor. ) | | |
| _____ ) | | |
| KENTUCKIANA MEDICAL ) | | |
| CENTER LLC, FIRST TENNESSEE ) | | |
| BANK, N.A., ) | | |
|     Plaintiffs, ) | | |
| ) | | |
| v. ) | ADV. NO. 10-59080 | |
| ) | | |
| THE LEASING GROUP POOL II, LLC, ) | | |
|     Defendant. ) | | |
| _____ ) | | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This adversary proceeding was initiated by the filing of a Complaint for Declaratory Relief on April 1, 2011, wherein the Plaintiff, Kentuckiana Medical Center LLC ["KMC"] seeks to declare that three leases ["Leases"] that KMC executed and delivered to the Defendant, The Leasing Group Pool II, LLC ["Leasing Group"] are not true leases but rather are disguised security agreements. It

now comes before the Court on the **Motion for Summary Judgment by Defendant, The Leasing Group, LLC** which was filed on April 1, 2011.  The **Plaintiff's Combined Response to Motion for Summary Judgment and Cross-Motion for Summary Judgment** was filed on April 26, 2011.  Finally, the **Defendant's Combined Reply to Plaintiff's Response to Motion for Summary Judgment and Response to Cross-Motion for Summary Judgment** was filed on May 2, 2011.

Statement of Undisputed Facts

1. KMC is an Indiana limited liability company with its principal place of business in Clarksville, Indiana.  KMC operates a for-profit acute care medical facility that offers a range of care including cardiovascular, oncology, urology, internal medicine and plastics within its 36-bed facility.

2. The Leasing Group is a Kentucky limited liability company that facilitates business' acquisition of commercial equipment by partnering with banks to finance the transactions.  *See, Deposition of Dennis Turner*, pp. 6-8 (Feb.23, 2011).

3. KMC executed two (2) Commercial Lease Agreements on June 23, 2009, and another on September 3, 2009, whereby KMC leased medical equipment from Leasing Group.  The Leases are identified as Lease No. 11681, 11661, and 11684.

4. Each of the Leases provide that "if the lease has been paid in a satisfactory manner, as provided in paragraph 20, upon termination, the lessee will have an end of the lease purchase option of fair market value plus applicable sales or use tax."  *See Lease 11681*, Lease 11684, and *Lease 11661* at p. 1.

5. Each of the Leases have a sixty (60) month term.

6. Paragraph 20 of each of the Leases provides:

    PURCHASE OPTION: If no Default or Event of Default has occurred, and if Lessee has satisfactorily performed its obligations under this Lease, then at the end of the Term, Lessee shall have an option to purchase all (but not less than all) of the Equipment on the Termination Date, subject to the following terms and conditions: (a) If Lessee desires to exercise its option to purchase, it shall give Lessor written notice of its exercise not less than sixty (60) days before such Termination Date. (b) On or before such Termination Date, Lessee shall pay to Lessor in cash or by certified or cashier's check, or by

wire transfer of immediately available funds, the purchase price for the Equipment determined as provided in this Purchase Option provision. (C) The purchase price of the Equipment shall be the dollar amount or percentage of Lessor's Cost set out in Schedule B which is a part hereof (whichever blank is completed), which Lessor and Lessee agree is not less than the estimated Fair Market Sales Value of the Equipment at the end of the Term, reasonably estimated in good faith on the date of said Schedule. Upon satisfaction of all of those terms, Lessor shall transfer title to the Equipment to Lessee by bill of sale WITHOUT WARRANTY OF TITLE, AS IS, WHERE IS, WITHOUT ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER WARRANTY EXPRESS OR IMPLIED.

7. The Leases were amended to further define the parties' lease end agreement. The amendments state that "the Lessor and Lessee agree that the 'Fair Market Value' purchase option for the Equipment as set out in Paragraph 20 of the Lease, shall not be less than 10% of the Lessor's total acquisition cost of the Equipment" [the "Purchase Option"]. Such amendment was signed by both KMC and Leasing Group. *See Lease 11681, 11684, and 11661* at First Amendment.

8. As an alternative, the amendments provide that KMC may "renew the lease for a Renewal Term of 1 months (sic) at a monthly rental payment of [varying amounts](plus applicable sales and use taxes), after which title to the Equipment will transfer to the Lessee by Bill of Sale; the first renewal rental due and payable at the expiration of the original Lease Term" [the "Renewal Option"].

9. Finally, as a third option, paragraph 2 of the amendments provide that KMC may "return all Equipment to the Lessor as set out in Paragraph 8 of the Lease, pay any and all moving expenses, storage fees, sales commissions, and/or other selling expenses incurred by the Lessor in the sale of the Equipment, and guaranty to Lessor a minimum resale Equipment value equal to 10% of the Lessor's total acquisition cost."

10. Citizen's Union Bank ["Citizens"] provided the financing for the equipment that was leased to KMC pursuant to lease No. 11681 and Lease No. 11684. As a result, the Leasing Group entered into a "Promissory Note and Security Agreement" with Citizens and assigned a portion of the lease payments that were due to it pursuant to the foregoing leases. *See, Exh. D to Claim No. 3 and Exh. B to Claim No. 4.*

11. The Peoples Bank provided the financing for the equipment that was leased to KMC pursuant to Lease No. 11661. As a result, Leasing Group entered into a "Promissory Note and Security Agreement" with The Peoples Bank and assigned a portion of the

        lease payments that were due to it pursuant to the foregoing lease. *See Exh. F to Claim No. 5.*

12. The Leasing Group's acquisition cost, for the equipment leased to KMC on all three leases was $2,386,126.16. This total acquisition cost of the Leasing Group does not include sales tax for the equipment which would be an additional $167,028.84. *See Affidavit of Dennis Turner.*

13. KMC's total rental obligations on the Leases is $2,906,355.

14. The Leases provide, at paragraph 22, that they shall be construed under the laws of Kentucky.

15. KMC filed for bankruptcy protection on September 19, 2010, at which time the Leases were in arrears.

16. KMC's CFO, Nick Clark, testified in his deposition and in the evidentiary hearing on the Motion to Appoint Trustee that KMC treats the Leases as operating leases; that the rent on the Leases is included as an expense on KMC's income statement; that the net income is reported on its tax return; and that it does not claim a depreciation deduction for the equipment that is subject to the Leases.

17. The Leasing Group submitted an appraisal report dated March 3, 2011, prepared by Christopher Kinzie of Present Value LLC, which found the present fair market value of the equipment to be $1,561,200. *Exh. G to Motion; Affidavit of Christopher Kinzie.*

18. Kinzie further found the forecasted fair market value of the equipment, as of lease end in 2014, to be $414,600 and a forecasted liquidation value at such time of $207,300.

<u>Standard of Review</u>

Summary judgment is mandated where there are no disputed issues of material fact and the movant must prevail as a matter of law. *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party presents a prima facie showing that he is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegations or denials in its pleadings but must affirmatively show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex*, 477 U.S. at 323; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When reviewing facts in support of a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-American, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). The court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but rather to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249.

Applicable Law

The Leases each contain a choice of law provision which dictates that the validity, construction and performance of the contract is to be governed by reference to the laws of Kentucky. Indiana courts acknowledge that contractual choice of law provisions govern the substantive disputes that arise out of the contract. *Smither v. Asset Acceptance, LLC,* 919 N.E.2d 1153, 1157 (Ind.Ct.App. 2010); *and see, Gibraltar Fin. Corp. v. Prestige Equip. Corp.*, 925 N.E.2d 751 (Ind.Ct.App. 2010). Based upon the foregoing, the Court will interpret the contracts under Kentucky law.

Discussion

The issue before the Court is whether the Leases are true leases or are, in fact, disguised

security agreements. Whether a lease constitutes a security interest is a matter of state law, *Powers v. Royce, Inc. (In re Powers)*, 983 F.2d 88, 90 (7th Cir. 1993), and in this case, that law is found in Kentucky's version of the Uniform Commercial Code, which is codified at KRS 355.1-101 *et seq.* More specifically, the issue is governed by KRS 355.1-203 which provides as follows:

> (1) Whether a transaction in the form of a lease creates a lease or a security interest is determined by the facts of each case.
>
> (2) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>> (a) The original term of the lease is equal to or greater than the remaining economic life of the goods;
>> (b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>> (c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
>> (d) The lessee has an option to become the owner of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement.
>
> (3) A transaction in the form of a lease does not create a security interest merely because:
>> (a) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
>> (b) the lessee assumes risk of loss of the goods;
>> (c) The lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;
>> (d) The lessee has an option to renew the lease or to become the owner of the goods;
>> (e) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
>> (f) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market

value of the goods at the time the option is to be performed.

(4) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:
> (a) When the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or
> (b) When the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

(5) The "remaining economic life of the goods" and "reasonably predictable" fair market rent, fair market value, or cost of performing under the lease agreement must be determined with reference to the facts and circumstances at the time the transaction is entered into.

The analysis thus begins with the "bright-line" test in subsection (2) which provides that a transaction is a *per se* security agreement if the lessee's payment obligations for the right to possession and use of the goods is not subject to early termination by the lessee, and either:

> (a) The original term of the lease is equal to or greater than the remaining economic life of the goods;
> (b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
> (c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
> (d) The lessee has an option to become the owner of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement.

The Leasing Group concedes that the Leases do not provide for early termination by the Lessee but rather provide that early termination by KMC is an event of default under paragraph 13. The Leases further provide that, in the event of default, the Lessee is still obligated for the remainder due on the lease under paragraph 5 thereof. Because KMC could not simply return the equipment without incurring continuing financial responsibility, the first element of the aforesaid "bright-line"

test is satisfied.

The next question before the Court is whether one of the remaining elements may be shown to establish the transaction as a *per se* security agreement. KMC contends that the lease-end purchase price constitutes nominal consideration under subsection (d) hereinabove. Utilizing the test set forth in KRS 355.1-203(4), "additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." The Leasing Group, on the other hand, asserts that the consideration is *not* nominal under the express standard set forth in KRS 322.1-203(4)(b). That section states that additional consideration is not nominal if "when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed." KMC's reasonably predictable cost of performing under the Leases in the event the Purchase Option is not invoked at lease end, then, is at issue.

Looking at the terms of the Leases which define KMC's various options at lease end, it appears that there are actually three separate and distinct options that KMC can assert. First, the Lease provides that the "Fair Market Value" purchase option for the equipment would not be less than ten percent (10%) of Leasing Group's total acquisition cost ["Purchase Option"]. Next, KMC may "renew the lease for a Renewal Term of 1 month at a monthly rental payment" of a certain amount "after which title to the Equipment will transfer to the Lessee by Bill of Sale; the first renewal rental due and payment at the expiration of the original Lease Term" ["Renewal Option"]. Finally, KMC may "return all Equipment to the Lessor . . . pay any and all moving expenses, storage fees, sales commissions, and/or other selling expenses incurred by the Lessor in the sale of the Equipment, and guaranty to Lessor a minimum resale Equipment value equal to 10% of the Lessor's

8

total acquisition cost" ["Return Option"].

The Purchase and Renewal Options result in the same payment obligations to the Leasing Group and both ultimately result in ownership vesting in KMC. Under the Return Option, KMC is responsible for moving and storage fees, sales commissions, and any other expense related to the sale of equipment. In addition, KMC remains responsible to the Leasing Group for the full purchase price less any proceeds that the Leasing Group may generate from the sale of the equipment. KMC asserts that the "reasonably predictable cost" of returning the equipment would exceed its cost under the Purchase Option.

Certainly, KMC would incur significant expense to remove the equipment and ship it to a location directed by the Leasing Group. It would have to be stored for approximately 180 days under normal market conditions[1] and KMC would be responsible for other expenses incurred by Leasing Group in connection with the sale, including the sales commission. Most significantly, KMC would remain responsible to Leasing Group for the full purchase price of the equipment less any proceeds realized by Leasing Group in a subsequent resale. In the event that the Leasing Group is unsuccessful in locating a willing buyer, it is extremely likely that the cost of returning the equipment would result in a higher cost to KMC than exercising the Purchase Option. However, KRS 255.1-203(5) states that the "reasonably predictable" fair market value or cost of performing under the lease agreement must be determined with reference to the facts and circumstances at the time the transaction is entered into.

The analysis the Court must undertake is not a simple one and there is little guidance from

---

[1] *See Exhibit G* to Defendant's Motion for Summary Judgment, Summary Appraisal Report of Machinery and Equipment, p. 24.

Kentucky courts to assist the Court with such a determination. Several other courts have, however, grappled with this provision of the Uniform Commercial Code. In one such case, the court noted that "the issue of whether a financing transaction denominated as a 'lease' or a disguised security agreement is one of the most vexatious and oft-litigated issues under the Uniform Commercial Code." *In re Grubbs Const. Co.*, 319 B.R. 698, 709-710 (Bankr.M.D.Fla. 2005). In that case, the bankruptcy court observed that the drafting of leases has become quite sophisticated and the precise nature of a particular document lies in discovering the economic realities of a given transaction. *Id.* at 712. Under the economic realities test, "if at the end of the lease term, the only economically sensible course for the lessee to take is to exercise the option to purchase the property, then the lease is a security agreement." *Id.* at 715 (citations omitted). It focuses on the facts and circumstances existing at the time of the transaction as opposed to the time the option arises.

While the premise of the economic realities test is fairly simple, courts often focus on various "realities" in application. One case, equated the "bright-line" test with the economic reality of the case, finding that the purchase price was nominal, by definition, where it would cost less to purchase the collateral than to renew the lease. *In re Our Secret, Ltd.*, 282 B.R. 697 (D.N.M. 2002). Other courts, considering the total amount of rental to be paid through the lease, have concluded that the only sensible course of action would have been to exercise the option and purchase the collateral for a fraction of the total rental price. *Gangloff Industries, Inc. v. Generic Financing and Leasing, Corp.*, 907 N.E.2d 1059 (Ind.App. 2009); *see also*, *In re Royal Food Markets, Inc.,* 121 B.R. 913, 915 (Bankr.S.D.Fla. 1990). Still other courts have focused on the relation of purchase price to fair market value. *See, e.g., In re Phoenix Pipe & Tube, L.P.*, 154 B.R. 197 (Bankr.E.D.Pa. 1993).

In this case, the Leasing Group's acquisition cost of the equipment, in 2009, was

10

$2,386,126.16. It obtained an Appraisal of the Equipment which estimated that the forecasted fair market value of the equipment, as of 2014, would be $414,600, and forecasted an orderly liquidation value, as of that same date, of $207,300. In order to exercise the Purchase or Renewal Options, KMC is bound to pay approximately $238,612.00. Should KMC choose to return the equipment, it must provide for all expense of removal and resale, as well as to ensure the full purchase price to the Leasing Group. In other words, all the cost and risk of selling used and specialized equipment falls on KMC.

Turning again to the determination of the "reasonably predictable cost" of performing if the purchase option is not exercised, it is the Court's opinion that the Leases were structured in such a way as to make KMC's "reasonably predictable cost" of returning the collateral exceed the cost of purchase. The Court finds that the bright-line test of KRS 255.1-203(2)(d) is satisfied as well as the economic realities test otherwise known as the "sensible person" test. After making almost $3 million in rental payments over a five year period, no sensible person would chose to incur significant additional expense to abandon equipment, essential for ongoing operations, when it could purchase the equipment outright for an arguably nominal amount.

For the foregoing reasons, the Court finds that the lease transactions between KMC and the Leasing Group are in the nature of security agreements. The Court does, accordingly, **GRANT** the **Plaintiff's Cross-Motion for Summary Judgment** and **DENY** the **Motion for Summary Judgment by Defendant, The Leasing Group, LLC.**

**IT IS SO ORDERED AND ADJUDGED.**

###